Blake Hunter Yagman*
*blake.yagman@yagmanpllc.com*
   YAGMAN PLLC
1050 30th St. N.W.
Washington, D.C. 20007
Tel.: (929) 709-1493

*Pro Hac Vice Forthcoming*

[ADDITIONAL COUNSEL ON SIGNATURE PAGE]

*Attorneys for Plaintiff TinRx*
*and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| TIN RX HOLDING COMPANY, INC. and TIN RX THE INDEPENDENT NETWORK, INC, on behalf of itself and all others similarly situated<br><br>                    *Plaintiffs*,<br><br>        v.<br><br>CVS PHARMACY, INC.,<br><br>                    *Defendant*. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs TIN RX HOLDING COMPANY, INC. and TIN RX THE INDEPENDENT NETWORK, INC. (collectively, "TinRx" or the "Plaintiff"), on behalf of itself and all others similarly situated, upon personal knowledge, information and belief, and the investigation of counsel, alleges the following Class Action Complaint (the "Action" or "Complaint") against Defendant CVS PHARMACY, INC. ("CVS Pharmacy") as well as unnamed co-conspirators CAREMARK, LLC ("CAREMARK"), HEALTH MART ATLAS LLC ("HMA"), and MCKESSON CORPORATION ("MCKESSON") seeking actual damages, statutory damages, restitution, treble damages, disgorgement of profit into a constructive trust, injunctive relief, a declaratory judgment, reasonable costs and attorneys' fees, as well as pre- and post-judgment interest, as follows:

## <u>NATURE OF THE ACTION</u>

1.     This Action is about Defendant CVS Pharmacy raiding the patient base of independent pharmacies – the lifeblood of America's healthcare system – in order to preserve and expand its' dominant market share.  Defendant and its co-conspirators will do so at any cost: even if it deprives patients of critical healthcare options and includes the destruction of businesses across the United States.

2.     Vertical integration, by itself, is not illegal.

3.     However, when a vertically integrated corporation maintains dominance in one key market – here, CVS Pharmacy's ubiquitousness is well-known

– in combination with the power to control the success or failure of its competitors, that integration becomes illegal when it is used to bludgeon competitors in that market. This is an Action on behalf of independent pharmacies – who have no choice other than to use co-conspirator CVS Caremark as their PBM to process prescriptions while also being forced to horizontally compete with CVS Caremark's sister company, CVS Pharmacy.

4. The quintessential example of this is plight of Plaintiff TinRx, an independent pharmacy that competed against CVS Pharmacy.

5. The story that this Complaint tells is a tale as old as free markets have existed: innovative entrepreneurs develop a business fit to change the world, and the old guard in that same industry take notice and act swiftly to choke it out in its developmental stages. Here, the most well-known healthcare conglomerate, CVS, did exactly that to TinRx and the harm is compounded because Defendant did not just harm commerce or the healthcare industry in general, but a business which served some of society's most vulnerable patients.

6. Built brick-by-brick by an immigrant named Christina Garcia and her life partner PJ Nachman, TinRx was an independent pharmacy and a first-mover in the digital pharmacy market space. TinRx rapidly reached astronomical success by following its founding motivation and motto: to create a "*stigma-free pharmacy*" which would provide prescription medication to patients seeking discrete care for

sensitive medical concerns. However, TinRx was told it was "flying too close to the sun" by a McKesson employee because it threatened the market share of CVS and McKesson in the healthcare industry. Specifically, by threatening CVS Pharmacy's dominance, Defendant and co-conspirators used their tremendous levers of power in four different lines of business to act within their own self-interest to drive TinRx into the ground before it could grow too large.

7.      Specifically, CVS, as TinRx's pharmacy benefit manager ("PBM") through its CVS Caremark subsidiary, weaponized its audit power over TinRx in August of 2023 to grind TinRx's business to a halt. While TinRx had passed dozens of audits beforehand, and never once encountered an audit like the one which transpired in August of 2023, this time was different. An employee at McKesson even ominously warned them as much, stating that TinRx "would not survive" its August 2023 audit.

8.      Then, Defendant's largest supplier of wholesale medications, McKesson Wholesale, stopped the flow of prescription medications to TinRx upon orders by Defendant's sister company, CVS Caremark. McKesson's Health Mart Atlas, the largest pharmacy services administrative organization ("PSAO"), then took its orders from Defendant's sister company, CVS Caremark – delivering the final blow to TinRx by cutting off its flow of funds so that it could no longer function.

9.      At bottom, this case illuminates the ability of powerful corporations to undercut competitors at the behest of all who rely on the American healthcare system.  But for the intense concentration, vertical integration and control, and self-interested dealing by the most powerful companies in the medical industry as well as CVS Caremark's abuse of its audit power (which, under ordinary circumstances, is ordinarily just a mechanism to ensure contractual and regulatory compliance) TinRx would still be providing care to this day.  This is not uncommon behavior for CVS Caremark – as its vertical integration and potential monopolistic grasp on the healthcare industry is now subject to proceedings before the United States Congress' House of Representatives' Judiciary Committee.

10.      Against this backdrop, Plaintiff TinRx brings this lawsuit on behalf of itself and all others similarly situated against Defendant which acted unlawfully to destroy TinRx. TinRx seeks actual damages, statutory damages, restitution, treble damages, disgorgement of profit into a constructive trust, injunctive relief, a declaratory judgment, reasonable costs and attorneys' fees, pre- and post-judgment interest, as well as any relief this court deems just and proper.

11.      Additionally, the injunctive relief which Plaintiff TinRx seeks is to force divestiture or otherwise unaffiliate CVS Pharmacy from its PBM sister company, CVS Caremark.

## JURISDICTION and VENUE

12.    This action arises under federal, state, and common law causes of action.  Under federal law, Plaintiff seeks relief for violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 16 of the Clayton Act (15 U.S.C. § 26), including injunctive relief, a declaratory judgment, costs of suit, pre- and post-judgment interest, and reasonable attorneys' fees.  Under state law, Plaintiff seeks relief for violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*), including actual damages, restitution, injunctive relief, costs of suit, and reasonable attorneys' fees.  Under the common law, Plaintiff seeks relief under the doctrine of unjust enrichment, including restitution, disgorgement of profit into a constructive trust, costs of suit, and reasonable attorneys' fees.

13.    *Subject Matter and Supplemental Jurisdiction.*  This Court has subject matter jurisdiction over this Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to remedy violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as under the state law and the doctrine of unjust enrichment, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337(a) and 1367.  This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert claims arising under the federal antitrust laws, as Plaintiff brings this Action to remedy violations of Section 1 of the Sherman Act.

14.    *Personal Jurisdiction.*   This Court has personal jurisdiction over Defendant because its principal place of business is in Woonsocket, Rhode Island. Additionally, this Court has personal jurisdiction over Defendant because they are registered to do business in Rhode Island, and a substantial part of the events that give rise to Plaintiff's claims occurred here.

15.    *Venue.*  Venue is proper here under 28 U.S.C. §1391(b), (c) and (d), because a substantial portion of the conduct described in this Complaint was carried out in the District of Rhode Island, and Defendant is headquartered and actively maintains business operations there.

## PARTIES

## PLAINTIFFS

### *Plaintiff TIN Rx Holding Company, Inc.*

16.    Plaintiff TIN RX Holding Company was domiciled in San Francisco, California.

### *Plaintiff TIN Rx the Independent Network Inc.*

17.    Plaintiff TIN RX the Independent Network Inc. was domiciled in Corning, California.

## DEFENDANT

### *Defendant CVS Pharmacy, Inc.*

18.    Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business located in Woonsocket, Rhode Island.  CVS Pharmacy is a wholly owned subsidiary of CVS Health and provides retail pharmacy services.

## UNNAMED CO-CONSPIRATORS

### *Conspirator Caremark, LLC*

19.    Caremark, LLC is a California limited liability company with its principal place of business located in Woonsocket, Rhode Island.  Caremark, LLC is a wholly owned subsidiary or affiliate of CVS Health and provides PBM and mail-order pharmacy services.

### *Conspirator Health Mart Atlas, LLC*

20.    Health Mart Atlas, LLC is a Delaware limited liability company with its principal place of business located in Irving, Texas.  HMA is a wholly owned subsidiary of McKesson Corporation.

### *Conspirator McKesson Corporation*

21.    McKesson Corporation is an Ohio publicly traded corporation with its principal place of business located in Irving, Texas.  McKesson Corporation provides wholesale distribution services of prescription medications to pharmacies and also owns Health Mart Atlas, a PSAO.

## FACTUAL ALLEGATIONS

### *PBMs, PSAOs, and the American Healthcare System*

19.    Beginning in the late 1950s, PBMs emerged address the growing need for managing prescription drug benefits provided by health insurers.  By the late 1980s, PBMs had expanded their role significantly, introducing systems for processing prescription drug claims and reimbursing pharmacies.

20.    Today, PBMs act as central intermediaries in the prescription drug supply chain, bridging the relationships between pharmacies, payers (including health insurers, employers, unions, and government entities), pharmaceutical manufacturers, and drug wholesalers.

21.    PBMs contract with health insurers, drug manufacturers, and pharmacies to facilitate the distribution of medications, process claims, and manage reimbursement.  They negotiate with drug manufacturers to include specific medications in their formularies, and contract with pharmacies to distribute these medications to insured patients, subject to the reimbursement terms and fees determined by the PBMs.

22.    By way of background, PBMs exist solely in the United States.  As a result, pharmaceuticals are significantly more expensive in the United States as compared to Europe, which sells much of the exact same medications.  Because of PBMs' control over the American healthcare system, they dictate pricing – and thus

profit handsomely.  According to the Pharmaceutical Research and Manufacturers of America, PBMs profited from over $140 billion in rebates and fees alone: a number which exceeds the total cost of medications sold overseas.

23.    Prescription drug transactions in the United States involve five to eight entities, many of which operate behind the scenes, unbeknownst to patients.  Over time, the U.S. prescription drug market has grown more intentionally complex and opaque, as has the process of prescribing medication itself.

24.    The process of prescribing a prescription medication begins when a healthcare provider prescribes a prescription medication to a patient and the provider sends, or patient takes, the prescription to the patient's chosen pharmacy.  The pharmacy submits a claim for the amount to be paid by the patient's insurance plan. The claim is not sent directly to the insurer, however, but rather to a PBM engaged by the insurer to administer the patient's prescription benefits.

25.    The PBM then calculates a payment to the pharmacy using secretive and inconsistent reimbursement formulas that are influenced by factors such as agreements between insurers and PBMs, PBMs and pharmacies or their PSAO — which negotiates on behalf of small and mid-sized independent pharmacies — pharmacies and drug suppliers or manufacturers, and insurers and their insureds. The PBM subsequently recoups reimbursement from the insurer based on a separate pricing structure negotiated between them.

26.   Consolidation and vertical integration has become a significant problem in the healthcare industry given the power that PBMs hold.  Beginning in the 1970s, PBMs embarked on a significant and ongoing process of horizontal and vertical integration within the prescription drug dispensing industry. And, by 2023, the "Big Three" PBMs — CVS Caremark, Express Scripts, and OptumRx — were responsible for processing nearly 80% of the approximately 6.6 billion prescriptions filled annually by pharmacies in the United States.

27.   Furthermore, PBMs, like CVS Caremark, are all vertically integrated, meaning they either own or are owned by companies that operate both upstream and downstream in the supply chain.

28.   As the Federal Trade Commission described in a recent report on PBMs:

> All of the top six PBMs are vertically integrated downstream, operating their own mail order and specialty pharmacies, while one PBM [CVS Caremark] owns and operates the largest chain of retail pharmacies in the nation.  Pharmacies affiliated with the three largest PBMs now account for nearly 70 percent of all specialty drug revenue. In addition, five of the top six PBMs are now part of corporate healthcare conglomerates that also own and operate some of the nation's largest health insurance companies, including three of the five largest health insurers in the country. Four of the PBMs are owned by publicly traded parent companies that own affiliates that operate health care clinics. Three have recently expanded into the drug private labeling business, partnering with drug manufacturers to distribute drug products under different trade names. Four healthcare conglomerates now account for

an extraordinary 22 percent of all national health expenditures, as compared to 14 percent eight years ago.[1]

29.    CVS Caremark provides a fitting example for such market concentration. Caremark's parent company, CVS Health Corporation, also owns CVS Pharmacy, CVS Caremark Mail Service Pharmacy, CVS Specialty Pharmacy, Aetna (the nation's third largest health insurance provider), Minute Clinic and Signify Health (health care providers), Cordavis Limited (a drug private labeler), and Zinc Health Services (a group purchasing organization).

### *Defendant and Co-Conspirators' Businesses and Relevant Background*

30.    This Action involves four parties which consist of a significant line of business owned by their two parent companies, CVS and McKesson, and each of which are major, multibillion dollar corporations which each have a substantial influence on the healthcare industry in the United States:

a.    ***CVS's CVS Pharmacy***, the largest retail chain of pharmacies in the United States;

b.    ***CVS's CVS Caremark***, the largest pharmacy benefit manager ("PBM") in the United States, responsible for negotiating prescription negotiation prices paid by consumers as well as claims and reimbursement rates paid from insurers to pharmacies;

---

[1]    FED. TRADE COMMISSION (2024), *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, Interim Staff Report at 2-3.

c. ***McKesson's Health Mart Atlas***, the largest pharmacy services administrative organization ("PSAO") in the United States, responsible for providing the administrative and infrastructure for pharmacists to run the backend of their pharmacy business; and,

d. ***McKesson's McKesson Wholesale***, one of the largest wholesale sellers of prescription medication to pharmacies for downstream sale to patients.

31. These four parties act as gatekeepers for the healthcare industry, controlling the flow of prescription medications by pharmacies as well as the purchase of prescription medications to patients.

32. Currently, patients seeking to fill prescriptions can do so through independent pharmacies, like TinRx was, or through retail chain pharmacies, like CVS Pharmacy. These two types of pharmacies compete head-to-head with each other for the same patient base – however, this competition is anything but fair, on the merits, or free of conflicts of interest.

33. On one hand, CVS's CVS Pharmacy chain is the most dominant market participant in the retail and specialty pharmacy market cross the United States; and, on the other hand, CVS's CVS Caremark is one of only very few PBMs, a third-party intermediary which negotiates prescription medication benefits with manufacturers as well as process claims for insurance reimbursement for

prescription medications.  In a similar vein, McKesson is the most dominant wholesale distributor of prescription medications in the United States through its McKesson Wholesale subsidiary, while also acting as one of the largest PSAOs for independent pharmacies through its HMA subsidiary, which offers the administrative infrastructure, payment processing, and other support a pharmacy needs to survive.  And so, if an independent pharmacy wishes to remain open, it must compete head-to-head with CVS Pharmacy while simultaneously allowing CVS Caremark to dictate the prices and reimbursements it receives to keep their pharmacy afloat; and it must depend on a wholesaler, like McKesson Wholesale, to both provide it with medication to purchase as well as a PSAO, like the digital infrastructure offered by HMA, to successfully sell those medications after purchasing them from McKesson Wholesale in the first place.

34.    To further complicate the difficulties of navigating this *Kafkaesque* landscape, CVS Pharmacy's predominant wholesaler of prescription medications is McKesson and McKesson's largest purchaser of wholesale prescription medications is CVS.  Thus, independent pharmacists not only have to compete against CVS Pharmacy's market power while allowing it to dictate its pricing as a PBM but also has to hope for fair and unconflicted dealing by two entities which are heavily reliant on each other for business.  Put differently, if a competitor capturing CVS Pharmacy's market share (despite CVS Caremark dictating prescription medication

sales pricing) is doing contracted with McKesson to provide prescription medications, then McKesson has the means, motive, and opportunity to do whatever it can to undermine that competitor's growth. According to a study about the relationships between healthcare conglomerates, including CVS and McKesson, experts in the pharmaceutical and healthcare industry concluded "… CVS and McKesson are undeniably central to the U.S. healthcare system, but their intertwined dominance raises critical ethical and operational questions. As these giants navigate regulatory scrutiny and public discontent, the challenge is clear: to recalibrate priorities and place patient well-being at the hear of their operations. Only by doing so can they fulfill their potential to lead not just an industry, but a transformation in healthcare."[2]

35.     Indeed, beginning as late as 2001, McKesson extended its existing distribution agreement with CVS Caremark through June of 2019 – which has been renewed numerous times since and runs through June of 2027. At the time of this extension, Paul Julian, executive vice president of McKesson Corporation, stated: "[w]e have a long track record of delivery comprehensive supply chain solutions to CVS Caremark which in turn allows CVS Caremark to ensure the highest level of

---

[2]   Abdul Shaik, Habeeb Yahya, and Dominic Leone, "*UnitedHealth Group, CVS Health, and McKesson: The Nexus of U.S. Healthcare*," MYLLIFE: LIVING THROUGH LEARNING (ONLINE) (Jan. 10, 2025), at https://myllife.org/news-events/newsroom.html/article/2025/01/10/unitedhealth-group-cvs-health-and-mckesson-the-nexus-of-u-s-healthcare.

pharmaceutical care to its customers. We are pleased to have extended our agreement with CVS Caremark and continue our long-standing relationship."[3] In 2021, McKesson released an annual report, which discussed insights about McKesson's relationship with CVS. In 2021 alone, CVS purchased over $50 billion in pharmaceuticals from McKesson with payment remitted every 24 days.[4] In large part, McKesson is the primary supplier of CVS's Caremark mail and specialty pharmacies – which directly competed with TinRx.[5]

36. McKesson has also benefited from CVS's aggressive merger and acquisition strategy. Indeed, as CVS has consolidated more of the pharmaceutical industry, its biggest ally, McKesson, has profited; specifically, "McKesson's revenues from CVS Health were further concentrated after CVS Health acquired Target's existing pharmacy business and Omnicare. Both of the acquired companies were existing McKesson customers so their purchases were reclassified as sales to CVS Health. Following these transactions, McKesson remained the primary wholesale supplier of brand-name drugs to Omnicare and Target."[6] Ironically, at

---

[3] https://investor.mckesson.com/news/financial-news/2014/McKesson-Extends-Pharmaceutical-Distribution-Agreement-with-CVS-Caremark/default.aspx, (last accessed Oct. 14, 2025).

[4] Adam J. Fein, "*How CVS Health Drives McKesson's Distribution Financials*," DRUGCHANNELS (ONLINE) (June 2, 2021), at https://www.drugchannels.net/2021/06/how-cvs-health-drives-mckessons.html.

[5] *Id.*

[6] *Id.*

the time of CVS announcing that McKesson would be the distributor to Target's pharmacies, which had been rebranded as CVS Pharmacy locations, McKesson chairman John Hammergren stated, "[w]hile our company has not been immune from the impact of consolidation within the health care supply chain, our customers continue to expand their relationships with us, driven by our ability to provide exceptional service and value."[7]

37.    On an earnings call in the third quarter of 2023. McKesson's chief executive officer and director, Brian S. Tyler, stated about CVS: "We've been partnering with CVS for a long time.  We're incredibly proud to support the work they do and be affiliated with them."[8]

38.    At the core of CVS Pharmacy's competition, and, therefore competition to McKesson's largest customer, are independent pharmacies: non-chain, largely mom-and-pop shops which attempt to woo patients by offering better pricing, more hands-on care, and intimate service.  Indeed, CVS's CVS Pharmacy subsidiary identifies pharmacies like TinRx as a competitor; for example, in CVS's 2018 Annual Report it states, "[w]e must maintain and improve our relationships with our […] specialty pharmacy customers and increase the demand for our products and

---

[7]  "*McKesson, CVS sign new pact for Target Rx*," CHAIN DRUG REVIEW (ONLINE) (Jan. 12, 2016), at https://chaindrugreview.com/28765-2/.

[8]  https://s24.q4cdn.com/128197368/files/doc_financials/2023/q3/MCK-US-20230201-2761065-C.pdf, (last accessed Oct. 14, 2025).

services […] [i]f we fail to differentiate our product from those of our competitors […] our ability to retain and grow our customer base may be adversely affected."

39.     To be sure, there is no love lost between chain pharmacies like CVS Pharmacy and independent pharmacies, like TinRx.  CVS has made every effort to paint the pharmacy industry as one where a business like TinRx can compete on the merits and survive, even commissioning and publishing a 2024 white paper written called "Independent Pharmacies: Myths Versus Reality."[9] In the white paper, CVS states that the dire warnings of independent pharmacies are pretextual and that independent pharmacies themselves are guilty of illegal collusion under the antitrust laws.[10]  In reality, however, independent pharmacies have struggled to survive due to CVS's ability to pull its own levers of power in order to stack the deck against independent pharmacy competitors, like TinRx.

---

[9]   https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/2024/drug-costs/2024-08-10-FTC-White-Paper-on-Independent-Pharmacies.pdf, (last accessed Oct. 7, 2025).

[10]   *Id.*, at 5, 37-38.

40.    According to an October 19, 2024 report by the New York Times, PBMs, like CVS Caremark "have been systematically underpaying small pharmacies, helping to drive hundreds out of business."[11]  Additionally, the New York Times found that PBMs "pay their own pharmacies more than what they pay local drugstores for the same medications.  Independent pharmacies are powerless to fight back."[12]  The result, which can be seen below, has resulted in mass closure of pharmacies across the country – leaving "pharmacy deserts" which prevent patients from being able to fill the prescriptions they need to survive:



---

[11]    Reed Abelson and Rebecca Robbins, "*The Powerful Companies Driving Local Drug Stores Out of Business*," NYTIMES (ONLINE) (Oct. 19, 2024), at https://www.nytimes.com/2024/10/19/business/drugstores-closing-pbm-pharmacy.html.

[12]    *Id.*

41.     According to David Joyner, CVS Caremark's former president (and now chief executive of CVS), the PBM's goal is to save money for employers (who sponsor health insurance plans), not to "keep independent drugstores afloat by paying them more than necessary."[13]  Joyner continues, "I think today you would argue that there are more pharmacies than we probably need."[14]

42.     David Whitrap, a spokesman for CVS Caremark, said that prescriptions filled at independent pharmacies as opposed to CVS Pharmacy 'inflates costs,' stating, "[i]ndependent pharmacies gain public sympathy when they spotlight instances when a specific drug is dispensed without much profit, while concealing other instances when a different drug is dispensed with substantial profit."[15]  However, the mass closure of independent pharmacies is anything but anecdotal – and the remaining independent pharmacies have to play ball with PBMs, like CVS Caremark, who prioritize their own chain pharmacies, like CVS Pharmacy, rather than offer fair contracts and fair dealing with the independent pharmacies.  As the New York Times states, "[independent p]harmacists say they have no choice but to agree to the contracts, even when the terms are unfavorable.  Because the top PBMs

---

[13]  *Id.*

[14]  *Id.*

[15]  *Id.*

collectively control the overwhelming majority of prescriptions, pharmacies that forfeit [doing business with them] could not survive."[16]

### *The Rise of TinRx*

43.     Over a decade ago, Christina Garcia and PJ Nachman founded TinRx, a groundbreaking, first-moving independent and specialty pharmacy.



44.     TinRx, driven by its slogan, "*a stigma-free pharmacy*," soon supported over 1.3 million patients across the United States through a powerful combination of digital and brick-and-mortar storefronts to provide affordable medications using discrete, unmarked packaging.  Because many of the prescriptions that TinRx dispensed were sensitive products,[17] TinRx quickly became the go-to pharmacy for

---

[16]  *Id.*

[17]  Including, but not limited to Truvada (a pre-exposure prophylaxis medication which nearly prevents and eliminates the transmission of HIV and AIDS), GLP-1 injectors (glucagon-like peptide-1 medications which are highly effective to treat weightloss and Type 2 diabetes), hormone therapy for gender affirming care, sexual performance mediations, SSRI and SNRI products (psychological medications), and other products (as well as every other medication an independent pharmacy can prescribe).

patients in need of these products but could be subject to negative personal repercussions (or even physical harm) if it were made known that they were receiving such care.

45.    An example of TinRx's packaging and advertisements appeared as follows:



We Deliver A
Better Pharmacy
Experience

Our unique pharmacy model, which leans heavily on technology, allows you to have both more freedom and more control over your pharmacy experience. Need to speak with a doctor...check. Need to lower the cost of your medications...we've got you covered. We offer online telehealth and medications, all the traditional pharmacy offerings.



46.     Quickly, TinRx rapidly became both a financial and medical success: earning over $300 million during its eight years of existence while dispensing between 130,000 and 200,000 prescriptions each year.

47.     TinRx's rapid growth is well illustrated by the fact that TinRx was able to meet aggressive goals financially demarcating its success.  For example, in a pitch deck sent to potential investors, TinRx highlighted some of these goals:



48.     To the detriment of TinRx, their large and vulnerable patient base, the healthcare industry, as well as TinRx's employees, McKesson and CVS would take notice of this accelerating growth and work to quickly stifle it.  The way that this

occurred was through the abuse of corporate systems already in place to allow McKesson and CVS to corrupt the healthcare system.

49.    Unfortunately for an independent pharmacy like TinRx, the only way to attempt to survive in an era dominated by industry concentration and shrinking margins is to do business with McKesson and CVS while also competing with them.

50.    At a minimum, this inherent conflict of interest prioritizes profit and self-interest over the healthcare of patients and the businesses, like TinRx, which financially put everything on the line to try to provide it.  And yet, TinRx was thriving amongst this landscape, having even been told at a conference by one of McKesson's employees that it was "flying too close to the sun."

### *The Plight of TinRx*

51.    Pharmaceutical auditing, which is a tool to ensure compliance with contractual, industry, and regulatory standards, was being used as a tool to bludgeon TinRx's business into submission.  Generally, audits are common practice in the pharmacy business.  According to the Academy of Managed Care Pharmacy's Model Audit Guidelines for Pharmacy Claims, which CVS's own employee (Brian J. Correia) helped write, "[a] properly designed audit process should be transparent and have a fair design and implementation.  Such a structure goes a long way towards

fulfilling its purpose of assuring the performance of the pharmacy network."[18]  As these guidelines state, "[w]hen an audit is seen as reasonable, transparent and fair in design and implementation, the entire process is raised to a professional and quality improvement level […] this would include timely notice of pending audit and its purpose, timely arrival to conduct the audit, timely notification of results, and a reasonable appeals process, as well as professional demeanor by the auditors."[19]

52.   On August 24, 2023, and as had happened numerous times before, TinRx received correspondence from CVS Caremark requesting the initiation of an audit for one of TinRx's locations.  Specifically, this audit would cover the period of May 1, 2022 through May 31, 2023, claiming "preliminary discrepancies were identified" with a disputed amount of $369,531.89 at one of TinRx's pharmacies. Additionally, HMA informed TinRx that there would be a reimbursement hold placed on TinRx so that they could not be paid back for the prescription medications sold until resolution of the audit by CVS Caremark.  This was uncharacteristic of past audits, which TinRx regularly passed (due largely in part because of TinRx's meticulous recordkeeping, compliance, and oversight by its in-house team dedicated to passing audits).

---

[18]   ACADEMY OF MANAGED CARE PHARMACY (JANUARY 2012), "*Model Audit Guidelines for Pharmacy Claims*" (Online), at https://www.akleg.gov/basis/get_documents.asp?session=28&docid=4941, at 2.

[19]   *Id.*, at 3.

53. Shortly thereafter, on September 5, 2023, McKesson, acting both a PSAO and as a wholesaler of prescription medication, emailed TinRx to inform them that they would place a credit and shipping hold on four of TinRx's largest locations, even through CVS Caremark's audit only applied to one of TinRx's nine locations – enabling McKesson to effectively stop the flow of prescription medication to TinRx for downstream sale as well as withhold funds needed to keep the business running. McKesson told TinRx in that same email that they were able to take these harsh actions until CVS Caremark informed them of initial audit findings.

54. Later on, in an email dated October 9, 2023, TinRx received confirmation of this which stated in relevant part, "HMA is currently withholding $369,531.89 in reimbursements from CVS Caremark, after receiving a copy of CVS Caremark's letter to TinRx dated August 30, 2023 stating that preliminary discrepancies in the amount of $369,531.89 were identified during a recent audit of TinRx […] [c]onsistent with HMA's standard practice, once HMA receives preliminary audit finding from [CVS] Caremark, HMA may withhold funds from pharmacy's Central Pay reimbursements until the preliminary audit amount has been collected, as those claims are at risk for being pulled back by [CVS] Caremark." The result of this was that TinRx had no funds flowing through the business and was now in debt to McKesson.

55. At this point, McKesson used TinRx's vulnerability to its advantage.

56.    On September 11, 2023, McKesson offered TinRx several promissory notes as a pretextual lifeline to keep TinRx in business: though, make no mistake, the threat of TinRx's demise was being caused by McKesson, and McKesson manipulated TinRx's desperate desire to stay in business into another way for McKesson to extract additional profit from the very pharmacy it was running into the ground.  The promissory notes (hereinafter, the "Notes") were offered to support the five pharmacies that McKesson had placed holds on in the amounts of $31,440.52, $143,600.47, $194,529.69, $349,802.08, and $165,613.27 with a 10.5% annual interest rate.  The added financial burden of having to repay the Notes placed even more stress on TinRx's business, which compounded the harm caused by CVS Caremark's audit and McKesson's use of credit and distribution holds.

57.    On September 12, 2023, an early morning video conference call between seven McKesson/HMA employees and TinRx, TinRx was told by a HMA Vice President and General Manager of McKesson that they "would not pass" this audit and that "no one ever" passes an audit of this size – even though the audit was to be performed under the authority of TinRx's PBM, CVS Caremark.

58.    On September 14, 2023, TinRx informed HMA that they had not received reimbursements for at least one TinRx location (TIN Rx # 806) which was outside of the scope of the CVS Caremark audit.  A Managed Care Regional Director of HMA replied that morning informing that three of TinRx's locations which were

not part of of the CVS Caremark audit were on central pay hold "to offset negative balances." On the following day, September 15, 2023, TinRx requested a report about these central pay holds and the status of the $369,531.89 which HMA claimed was still due to remove the holds, stating "[t]his is critical to us. We have zero money coming in until that point and I need your assistance urgently."

59. On September 25, 2023, TinRx emailed HMA stating, "[p]er our calculation the central pay hold should be removed TODAY. Please advise where we stand today." On the same day, HMA stated that TinRx still had a balance of $33,785.03 and that HMA "will re-evaluate the [central pay] hold over the next couple of days hoping that it is fulfilled."

60. On September 26, 2023, HMA emailed TinRx that they were "using the other [TinRx] locations to offset the balances for the week and the remaining balance then gets released to your bank account […] we anticipate the balance being fulfilled any day now and once it is then the hold will be lifted." Meanwhile, TinRx was being bled dry and had zero money coming in as a result of the central pay hold caused by CVS Caremark's audit.

61. On September 28, 2023, TinRx followed up with HMA stating, requesting "an update as the amount of hold should have already been met." HMA then replied, "I'll have an update for you by end of day."

62.    On September 29, 2023, HMA stated that TinRx's California locations were released from the hold but that TinRx's Texas locations "are using the incoming reimbursements to offset the negative balances then releasing the additional funds and remit statements to you."  Additionally, TinRx requested on September 29, 2023 that "if we have fulfilled the $369k hold, I need an official confirmation and/if so, what is being shared with [CVS] Caremark regarding the amount being held?"

63.    On October 3, 2023, HMA stated that they would not be able to provide this official confirmation until the end of the week.  At the end of the week, on October 6, 2023, no confirmation that the hold had been fulfilled was provided to TinRx by HMA.

64.    On October 9, 2023, HMA stated that TinRx was still on central pay hold:

> TinRx's Pharmacy Participation Agreements with Health Mart Atlas (HMA) provides that if the pharmacy is or is reasonably anticipated by HMA to become subject to a negative charge, recoupment, true-up or other fee or clawback from a Payor, or otherwise has a debit balance for one or more of pharmacy locations, HMA may withhold funds received under the Consolidated Reimbursement Program from future payments to the pharmacy until the pharmacy's balance for all location(s) for all Payors is zero dollars or above. Consistent with this provision HMA is currently withholding $369,531.89 in reimbursements from CVS Caremark, after receiving a copy of CVS Caremark's letter to TinRx dated August 30, 2023 stating that preliminary discrepancies in the amount of $369,531.89 were identified during a recent audit of TinRx at the Tower.

Consistent with HMA's standard practice, once HMA receives preliminary audit finding from Caremark, HMA may withhold funds from pharmacy's Central Pay reimbursements until the preliminary audit amount has been collected, as those claims are at risk for being pulled back by Caremark. If the final audit finding is less that the amount withheld from the pharmacy, HMA will reimburse the pharmacy that amount as soon as operationally possible. If the final audit finding is greater than the amount withheld from the pharmacy, HMA will withhold additional reimbursement from future Central Pay reimbursements from the pharmacy needed to cover the remaining amount of funds recouped by Caremark.

65.    By December 18, 2023, TinRx was informed that they had passed over 86% of CVS Caremark's audit with only a minor discrepant amount of $68,786.46 which was partially due to pay CVS Caremark back for the costs of performing the audit itself. However, by this point, HMA still had not lifted the holds placed on TinRx's pharmacies and further refused to reimburse the disputed amounts due to TinRx while TinRx's Notes continued to accrue even more interest. The financial strain and damage to its business, including the ability to dispense medication to TinRx's highly vulnerable patients, was too much to bear – and TinRx was forced to close its doors by April of 2024. The damaging economic and medical impact of this "audit" and McKesson's subsequent conduct at CVS's command is best

illustrated by TinRx's financials as well as its prescription dispensing history, noting a substantial drop comparing 2022 and 2023:

| | Revenue | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Location/Yr | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| 801 | 2,470,868.86 | 3,432,225.74 | 3,447,965.78 | 3,231,526.08 | 2,724,239.38 | 2,594,616.02 | 2,607,647.06 | 1,442,126.57 | 21,951,215.49 |
| 802 | 4,010,060.09 | 3,058,431.7 | 2,780,591.31 | 2,828,092.3 | 2,641,993.33 | 2,974,164.93 | 3,590,834.73 | 1,896,732.73 | 23,780,901.12 |
| 803 | 0 | 0 | 0 | 14,118.72 | 79,703.16 | 128,271.93 | 339,329.15 | 128,774.52 | 690,197.48 |
| 804 | 0 | 0 | 0 | 0 | 19,433.12 | 574,334.71 | 1,932,702.92 | 1,396,404 | 3,922,874.75 |
| 805 | 3,438,976.88 | 33,224,054.85 | 21,679,086.35 | 7,236,643.13 | 4,294,410.23 | 2,253,495.95 | 649,402.27 | 480,732.56 | 73,256,802.22 |
| 806 | 3,438,976.88 | 33,224,054.85 | 21,679,086.35 | 7,236,643.13 | 4,294,410.23 | 2,253,495.95 | 649,402.27 | 480,732.56 | 73,256,802.22 |
| 807 | 16,421,970.36 | 23,165,104.51 | 24,711,622.28 | 18,036,136.95 | 9,443,363.78 | 4,838,982.71 | 2,451,847.39 | 545,668.42 | 99,614,696.4 |
| 808 | 0 | 0 | 0 | 853,090.02 | 4,621,727.69 | 385,640.22 | 337,896.1 | 417,887.21 | 6,616,241.24 |
| Total | 29,780,853.07 | 96,103,871.65 | 74,298,352.07 | 39,436,250.33 | 28,119,280.92 | 16,003,002.42 | 12,559,061.89 | 6,789,058.57 | 303,089,730.92 |

66.    On a more granular level, the devastation caused by the CVS Caremark audit, as well as McKesson/HMA's subsequent conduct, can be seen in the monthly sales statistics (by location) in 2023 which show a precipitous collapse beginning in August of 2023 when the audit initially began:

| | Revenue | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Location/Yr | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| 801 | 2,470,868.86 | 3,432,225.74 | 3,447,965.78 | 3,231,526.08 | 2,724,239.38 | 2,594,616.02 | 2,607,647.06 | 2,695,545.20 | 23,204,634.12 |
| 802 | 4,010,060.09 | 3,058,431.70 | 2,780,591.31 | 2,828,092.30 | 2,641,993.33 | 2,974,164.93 | 3,590,834.73 | 3,492,548.77 | 25,376,717.16 |
| 803 | - | - | - | 14,118.72 | 79,703.16 | 128,271.93 | 339,329.15 | 2,653,321.72 | 3,214,744.68 |
| 804 | - | - | - | - | 19,433.12 | 574,334.71 | 1,932,702.92 | 1,885,582.08 | 4,412,052.83 |
| 805 | 3,438,976.88 | 33,224,054.85 | 21,679,086.35 | 7,236,643.13 | 4,294,410.23 | 2,253,495.95 | 649,402.27 | 650,094.52 | 73,426,164.18 |
| 806 | 3,438,976.88 | 33,224,054.85 | 21,679,086.35 | 7,236,643.13 | 4,294,410.23 | 2,253,495.95 | 649,402.27 | 1,529,227.23 | 74,305,296.89 |
| 807 | 16,421,970.36 | 23,165,104.51 | 24,711,622.28 | 18,036,136.95 | 9,443,363.78 | 4,838,982.71 | 2,451,847.39 | 598,175.81 | 99,667,203.79 |
| 808 | - | - | - | 853,090.02 | 4,621,727.69 | 385,640.22 | 337,896.10 | 476,416.43 | 6,674,770.46 |
| Total | 29,780,853.07 | 96,103,871.65 | 74,298,352.07 | 39,436,250.33 | 28,119,280.92 | 16,003,002.42 | 12,559,061.89 | 13,980,911.76 | 310,281,584.11 |

| Month | 801 | 802 | 803 | 804 | 805 | 806 | 807 | 808 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| January | 238,008.40 | 320,382.02 | 231,266.58 | 237,379.95 | 40,103.44 | 245,955.14 | 111,041.02 | 20,480.69 | 1,444,617.24 |
| February | 239,956.15 | 287,346.61 | 227,304.68 | 254,905.51 | 38,642.94 | 214,815.84 | 113,636.59 | 18,412.61 | 1,395,020.93 |
| March | 246,765.47 | 340,913.67 | 302,931.54 | 278,450.85 | 124,851.40 | 241,537.82 | 114,227.64 | 56,762.77 | 1,706,441.16 |
| April | 214,022.83 | 320,714.23 | 261,533.43 | 172,396.78 | 147,667.84 | 160,237.15 | 76,456.18 | 158,247.11 | 1,511,275.55 |
| May | 270,268.07 | 331,784.99 | 277,846.91 | 249,357.32 | 104,693.58 | 177,179.98 | 84,879.19 | 114,283.88 | 1,610,293.92 |
| June | 233,665.09 | 299,320.38 | 244,456.07 | 215,159.69 | 21,690.93 | 163,031.16 | 78,840.87 | 54,283.32 | 1,310,447.51 |
| July | 221,366.84 | 319,493.82 | 226,917.57 | 244,975.98 | 90,159.64 | 110,694.42 | 19,094.32 | 53,946.05 | 1,286,648.64 |
| August | 222,968.81 | 345,678.09 | 229,991.67 | 157,530.91 | 82,284.75 | 174,880.84 | | | 1,213,335.07 |
| September | 238,632.92 | 282,127.69 | 200,939.99 | 91,814.87 | | 76,058.96 | | | 889,574.43 |
| October | 217,895.21 | 276,760.75 | 203,158.56 | (16,389.78) | | (12,788.78) | | | 668,635.96 |
| November | 176,063.20 | 162,834.65 | 122,527.63 | | | (24,059.30) | | | 437,366.18 |
| December | 175,932.21 | 205,191.87 | 124,447.09 | | | 1,684.00 | | | 507,255.17 |
| TOTAL | $2,695,545.20 | $3,492,548.77 | $2,653,321.72 | $1,885,582.08 | $ 650,094.52 | $1,529,227.23 | $ 598,175.81 | $ 476,416.43 | 13,980,911.76 |

67.     At a minimum, TinRx being told it would not survive an audit and then actually not surviving it is far outside the bounds of acceptability for a process meant to serve merely as a compliance and regulatory check.  According to TinRx, the audit initiated by CVS Caremark was different than the many audits TinRx had experienced (and passed) in the past: (1) TinRx's audit team noted that the invasive scope of documents requested was well beyond the normal set of requests, (2) CVS Caremark ignored provider statements and patient consent documentation which are generally accepted methods of evidence production to overcome an audit, and (3) CVS Caremark's reimbursements for prescription medications disbursed were withheld for months, which was not only uncommon in comparison to previous audits but had harsh effects on TinRx's ability to maintain cash flow and operate.

68.     The contracts that an independent pharmacy signs, as TinRx did with CVS Caremark, HMA, and McKesson Wholesale, are not for the benefit of entities which are not parties to those respective agreements.  Put differently, CVS Caremark and HMA/McKesson Wholesale do not work for the benefit of each other – even if their interests are so significantly aligned and intertwined.  In fact, TinRx's contract with HMA governing HMA's PSAO relationship with TinRx provides that "[t]his Agreement is intended for the exclusive benefit of the parties to this Agreement and their respective successors and assigns.  Nothing contained in this Agreement shall be construed as creating any rights or benefits in or two any third party."  And yet,

HMA enforced rights under its contract with TinRx, namely, the ability to cut off access to central pay, as a benefit to TinRx's PBM, CVS Caremark, which was not a party to that contract.

69. The core motivation for this conduct was the relationship between CVS and McKesson generally, and the business relationship that their subsidiaries participated in to the financial success of each company's parent. Allowing TinRx to thrive would risk and possibly even undercut all of this financial success and, in turn, Defendant's actions thereafter exposed the innerworkings of how CVS and McKesson do business with each other.

70. This is made clear by CVS Caremark's targeting of TinRx because of TinRx's business relationship with a market disruptor called GiftHealth.

71. Specifically, one of the companies that TinRx was doing business with was called GiftHealth. GiftHealth's primary role, like TinRx, was also to serve as a disruptor in the pharmacy business – allowing patients and providers to digitally source independent pharmacies capable of distributing prescription medications. Beginning in January of 2023 and before its closure, TinRx was part of GiftHealth's network of independent pharmacies.

72. On September 22, 2023, GiftHealth's President and Co-Founder emailed TinRx inquiring about late payments called by CVS's audit. After an exchange of emails about the audit, on October 10, 2023, GiftHealth's President and

Co-Founder expressed profound concerns about the legitimacy of the audit and the outsized impact it was having on TinRx's business stating, "[t]he audit sent to me included 138 patients and 50 with copays. If CVS clawed back all 138 patients, the maximum exposure would be less than $20,000." Later in the day, TinRx warned GiftHealth that a possibility of why TinRx was targeted was because of both business' reputations as disruptors, stating, "[g]etting involved with your business model caused this avalanche and I have nothing. I don't know how far it will go and how many other locations that nothing to do with [GiftHealth] will continue to be affected or audited by [CVS] Caremark because they have tagged us as doing business with you." Shortly thereafter, GiftHealth's President and Co-Founder replied, "I don't know how CVS [Caremark] can legally give you so many problems over the 138-patient audit" to which TinRx replied "I hope no other pharmacies fulfilling for GiftHealth get caught in this."

### *Defendant and Co-Conspirators' Systemic Conduct*

73.    CVS Caremark often decides how it rigorously it wishes to apply its own standards for audits as well as to benefit itself by steering patients to CVS Pharmacy – and state governments across the country are beginning to take notice.

74.    In early October of 2025, the State of New York released an audit of the "effectiveness of CVS Caremark Audits" of New York's prescription drug

program.[20] The conclusions of the *NYS Audit* are disturbing given CVS's gatekeeper role for much of the healthcare industry. The report found that: (1) CVS Caremark only reviewed a "minimal number" of claims as a sample size, (2) CVS Caremark, while it conducted expanded field audits on independent pharmacies (which are CVS Pharmacy's core competitors) it did not conduct any such audits on its own chain, CVS Pharmacy; and (3) CVS Caremark maintains that the responsibility to detect and refer "fraud and abuse" lies with the plan's administrators and not CVS Caremark.[21] CVS Caremark's refusal to detect fraud and abuse "may have allowed cases [of fraud and abuse] to go unnoticed."[22] The state of New York's comptroller estimates that losses from "uncontrolled fraud, waste and abuse" between January 2019 and December 2023 could have exceeded $1.75 billion for New York alone; however, despite New York having a contract which states otherwise, CVS Caremark denies investigating fraud was not a responsibility that was theirs.[23]

75. In West Virginia, the West Virginia Insurance Commissioner found that CVS Caremark "used more stringent criteria than required by statute for what is

---

[20] NEW YORK STATE HEALTH INSURANCE PROGRAM (OCT. 2025), "*CVS Caremark: Effectiveness of CVS Caremark Audits of the Empire Plan Prescription Drug Program*" (Online), at https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2026-24s4.pdf (hereinafter the "*NYS Audit*").

[21] *NYS Audit,* at 1.

[22] *Id.*

[23] *Id.*, at 7.

considered acceptable […] during an audit" and that CVS Caremark "recouped funds from pharmacy claims in excess of actual harm associated with the dispensed product."[24]  In the *WV Audit*, CVS Caremark was also found to engage in self-dealing by imposing "a monetary advantage or penalty under a health benefit plan that affected the member's choice among pharmacies" and "inappropriately steer[ing] members to a mail order pharmacy."[25]

76.    In Minnesota, the Minnesota Department of Commerce levied a $500,000 penalty against CVS Caremark because "Caremark violated state law prohibiting the steering of patients to pharmacies or mail-order prescriptions services in which Caremark and an ownership interest."[26]  As a result of this "Caremark enrollees complained of being forced to drive up to 130 miles to fill prescriptions."[27] This type of steering practice insulates CVS Pharmacy's market share in communities across the country, and is only made possible through CVS's vertical integration and *Standard Oil*-like chokehold over the healthcare industry where it simultaneously controls the largest PBM and the largest pharmacy chain in the

---

[24]   *In the Matter of Caremark, LLC and CaremarkPSC Health, LLC*, Admin. Pro. No. 25-IC-179343 (W. Va. Ins. Comm. Feb. 26, 2025), at 3 (hereinafter the "*WV Audit*").

[25]   *Id.*, at 4.

[26]   MINNESOTA DEPARTMENT OF COMMERCE (MAY 1, 2023), "*Commerce fines CVS Caremark $500,000 after 2022 case alleging violations of Pharmacy Benefit Manager Act*" (Online), at https://mn.gov/commerce/news/?id=17-575233.

[27]   *Id.*

United States. Other states, like Oklahoma, have taken similar action as Minnestoa has, and some states, like Arkansas, have even passed legislation forcing CVS to choose: either continue to run the CVS Caremark PBM and divest from CVS Pharmacy, or leave the Arkansas entirely.

77. For decades, American citizens have been at the behest of healthcare conglomerates like CVS and McKesson – paying the price in the form of higher prescription costs, reduced quality at the pharmacy counter, and a loss of competitive choice. As a result of this, the role of entities like CVS and McKesson are under intense scrutiny at long last, reaching the highest levels of the federal government.

78. In October of 2024, a bipartisan group of United States Members of Congress introduced the Pharmacy Audit and Compensation Act ("PhACT"), which would direct the Secretary of Health and Human Services to investigate how PBMs audit pharmacists in an effort to make recommendations with the goal of more transparency and fairness.[28] The bill was co-sponsored by a member of Congress who was herself an independent pharmacist (Rep. Diana Harshbarger, R-Tn.) and inspired by the fact that "PBMs – the middlemen of drug pricing – often audit pharmacists when issuing [] reimbursements. These audits lack clear metrics and often include requirements without clear medical rationale. Pharmacists widely

---

[28] https://maloy.house.gov/news/documentsingle.aspx?DocumentID=1352, (last accessed Oct. 14, 2025).

report thee audits are a pretense for withholding additional reimbursement funds […]

Many pharmacists report failing PBM audits as the primary reason they cannot stay in business.   More than 2,000 pharmacies closed in 2024, and one in three independent pharmacists are considering closing their doors for good."[29]

79.    The compelling testimony collected in favor of the passage of PhACT echoes many of the same concerns expressed in this Complaint:

*Independent pharmacies are essential to Main Streets in Utah and across the country.  But many have been forced to close their doors thanks to unfair PBM audits that lack clear metrics.*

United States Congresswoman Celeste Maloy (R-Ut.)

*Pharmacy Benefit Managers (PBMs) have been taking advantage of independent pharmacies for years through opaque business practices, including their unfair audits of independent pharmacies.  This behavior has forced the closure of thousands of community pharmacies and denied necessary prescription drug coverage to millions of Americans.*

United States Congressman Raja Krishnamoorthi (D-Ill.)

*As a pharmacist, I know firsthand how PBMs often use aggressive audit practices as a weapon to harass independent small pharmacies and claw back reimbursements for their own financial gain.  For community pharmacists, it's like playing a high-stakes game without knowing the rules – or worse, with no rules at all!*

United States Congresswoman Diana Harshbarger (R-Tn.)

*Audits of pharmacies are often used as an additional revenue source for PBMs, a bullying tactic that targets community pharmacies and*

---

[29]  *Id.*

*recoups vast sums of money for what are often nothing more than harmless clerical errors. Unfortunately, audits are becoming broader, more frequent, and increasingly aggressive.*

Anne Cassity, Senior VP of Gov. Affairs,
National Community Pharmacists Association

80.    Additionally, the Federal Trade Commission ("FTC") has taken decisive action against CVS's role as both a PBM and a competitor in the pharmacy industry, including releasing reports on the conduct of PBMs (including CVS Caremark) and filing lawsuits to seek relief for unlawful conduct by PBMs under federal law which have allegedly led to patients paying significantly higher prices for life saving medication, like insulin.  The actions of the FTC strike at the very heart of the allegations in this complaint.  For example, in one of the FTC's reports, "Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies," the FTC states in it's Executive Summary that "amidst increasing vertical integration and concentration, [PBMs, like CVS Caremark] may be profiting by inflating drug costs and squeezing Main Street pharmacies."[30]

81.    As the *Second FTC Report* states:

---

[30]    FEDERAL TRADE COMMISSION (JULY 2024), "*Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*," at https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf (the "*Second FTC Report*").

PBMs [] exert substantial influence over independent pharmacies, who struggle to navigate contractual terms imposed by PBMs that they find confusing, unfair, arbitrary, and harmful to their businesses. Between 2013 and 2022, about ten percent of independent retail pharmacies in rural America closed. Closures of local pharmacies affect not only small business owners and their employees, but also their patients. In some rural and medically underserved areas, local community pharmacie are the main healthcare option for Americans, who depend on them to get […] life saving medicines.[31]

82.    Indeed, the Second FTC Report continues, in relevant part:

**Vertically integrated PBMs may have the ability and incentive to prefer their own affiliated businesses, which in turn can disadvantage unaffiliated pharmacies and increase prescription drug costs.** Vertical integration in PBM business structures, particularly with respect to [] specialty and mail order pharmacies, likely creates the ability and incentive for PBMs to increase utilization of certain drug products at affiliated pharmacies to generate the greatest revenue and profits for their respective conglomerates. As a result of vertical integration, PBM-affiliated pharmacies now compete with the unaffiliated pharmacies to distribute medications to patients.

…

**Evidence suggests that increased concentration may give the leading PBMs the leverage to enter into complex and opaque contractual relationships that may disadvantage smaller, unaffiliated pharmacies and the patients they serve.** Independent pharmacies generally lack the leverage to negotiate terms and rates when enrolling in PBMs' pharmacy networks[.][32]

83.    Additionally, the FTC has also taken action in federal court against

PBMs, including CVS Caremark, in an attempt to redress alleged schemes to

---

[31]    *Second FTC Report*, at 1.

[32]    *Second FTC Report*, at 3-4 (emphasis not added).

artificially increase pricing for critical prescription medications, including GLP-1's and insulin.[33]

84. Further, the United States' House of Representatives' Committee on the Judiciary has begun to investigate CVS Caremark's potential antitrust and competition law violations, namely seeking information about CVS Caremark's "ability to control access to and pricing of pharmaceutical products [… including testimony by] expert witnesses [who] testified that PBMs could prevent independent pharmacies from working with innovative companies, including pharmaceutical hubs."[34]  The House Letter elaborates on testimony which warns of the abuse of audits that are at-issue in this Action:

> **CHAIRMAN JORDAN (SEPT. 2024):** "Can a large PBM tell an independent pharmacy, 'if you work with some new innovative company to bypass our network, we will cut off your pharmacy from our network and subject you to fees and audits?"
>
> **WITNESS:** "[This] probably happens."[35]

---

[33]  *In the Matter of Caremark Rx, LLC; Zinc Health Services LLC; Express Scripts, Inc.; Evernorth Health, Inc.; Medco Health Services, Inc.; Ascent Health Services LLC; OptumRx, Inc. OptumRx Holdings LLC; and Emisar Pharma Services LLC*, Case No. 9437 (F.T.C. Sept. 20, 2024), at ECF No. 1 ("*FTC Insulin Action*").

[34]  Letter to CVS Health, UNITED STATES HOUSE OF REPRESENTATIVES' COMMITTEE ON THE JUDICIARY (DEC. 12, 2024), at https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-12-12%20JDJ%20Massie%20to%20CVS%20re%20PBMs.pdf (the "*House Letter*").

[35]  *House Letter*, at 2.

85.    On January 21, 2026, the House Judiciary Committee released an interim report titled "When CVS Writes The Rules: How CVS Protects Itself From Innovation and Competition" which involves many of the same allegations Plaintiff alleges herein:[36]

> In September 2024, the Committee on the Judiciary began an investigation to examine whether pharmacy benefit managers (PBMs) use market power to suppress nascent competition and to assess if proposed legislation is necessary to address certain conduct by PBMs. […] The Committee has learned that CVS Health might be foreclosing competitior access to pharmacies by threatening independent pharmacies that worked with potential competitors to CVS Health.
>
> …
>
> Internal CVS Health documents produced to the Committee show that CVS Health acted to stifle innovation and reduce competition from hub pharmacy, which are companies that provide various digital pharmacy services to support consumer choice and price transparency. These documents show that CVS Health developed plans to establish its own suite of digital pharmacy services and then, instead of competing with hubs on the merits of their services, prevented independent pharmacies from using pharmacy services from hubs. To achieve this, CVS Health monitored the business relationships of independent pharmacies and hubs, modified its provider manual to create uncertainty for independent pharmacies working with hubs, used the modified provider manual as a pretext to audit independent pharmacies and sent cease-and-desist letters to those independent pharmacies found to be working with hubs.

---

[36]    UNITED STATES HOUSE OF REPRESENTATIVES' COMMITTEE ON THE JUDICIARY, "When CVS Writes The Rules: How CVS Protects Itself From Innovation and Competition," (Jan. 21, 2026), at https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2026-01/2026-01-21-When-CVS-Writes-the-Rules-How-CVS-Protects-Itself-from-Innovation-and-Competition.pdf, **Ex. A.**

…

Internal suggest that the monitoring, audits, and cease-and-desist letters were attempts to eliminate competition from an innovative business model meant to disrupt PBM-owned retail pharmacy networks, which may constitute a violation of the antitrust laws. […] By quietly allowing certain pharmacies to work with hub pharmacies, CVS Health essentially conceded that hub pharmacies and the independent pharmacies should be free to vigorously compete against CVS Pharmacy and CVS Caremark.

…

Here, CVS Health has the power to foreclose competitors from the opportunity to work with pharmacies because CVS Caremark's PBM network includes "all major chains and independent pharmacies." CVS Health's conduct is distinguished from competition on the merits because its behavior makes it more difficult for pharmacies to choose to work with hubs, deprives consumers of the benefits of these innovations, and creates barriers to entry for potential CVS Health competitors. Under antitrust law, CVS Health can defend its anticompetitive conduct by establishing a business justification. CVS' Health's justifications, however, are pretextual and likely would be rejected by a court.[37]

86.   One of the core concerns in the report is central to Plaintiffs' allegations, "[i]f the independent pharmacy refused to stop working with the hub pharmacies, it could face potential termination from CVS Caremark's pharmacy network. If an independent pharmacy is terminated from CVS Caremark's pharmacy network, it cannot dispense medications to patients whose insurance plan

---

[37]   Ex. A, at 2-3.

uses CVS Caremark's PBM, approximately 30 percent of the insured population."[38] Naturally, CVS Caremark did not adequately produce all of its relevant communications and cease-and-desist letters to independent pharmacies as required by a civil investigative demand, which resulted in a February 2025 order from a federal judge requiring CVS Health to hand over the material requested.[39]

87.    In the documents that CVS Health did produce, CVS's own internal documents highlighted hubs – like TinRx was – as competitive threats.  For example, CVS Health targeted delivery pharmacies (like TinRx) as a challenge to CVS's business model:

---

[38]    *Id.*
[39]    *Id.*

**Future Phases (beyond Q2 2021):**
*Seamless integration of central and local fill nodes and real time adjudication*

- **Create a hub pharmacy** to intake and route fill requests received from B2B2C partners and patients living far from a physical store
- **Transfer recurring Rx basket** seamlessly into multi-dose packs
- **Show real adjudicated price** during refill transaction
- Ability to **schedule delivery window** during refill transaction

- Home delivery of refills and recurring orders processed by low cost, highly automated central fill node

- Ability to call for medication inventory chain wide
- Ability to initiate claim adjudication and pass output to system of record (RxConnect)
- Bypass delivery confirmation for refills and recurring orders
- System to transfer scripts/fills from central hub to local store for same day pickup or delivery, then back to central hub

*Internal CVS plans to create an in-house hub pharmacy; CVS_HJC_00011020.*

88. To do this, and according to the Committee's Report, CVS's internal documents showed that the best way to compete with companies like TinRx was to copy their business model and to highlight "disruptors" in business presentations dating as far back as early 2020.[40]

89. CVS then targeted disruptors and independent pharmacies, including one pharmacy in California because "the dispensing profile [did] not appear to be a

---

40  *Id.*, at 14.

normal retail pharmacy" and another pharmacy because an auditor discovered the pharmacy uses an "off-site" location to process prescriptions and suggested it could be a hub.[41]    Targeting these companies puts them at the very same risk that manifested into a nightmarish reality for TinRx. The Report also found that CVS "worked to explicitly prohibit independent pharmacies from working with rival[s]."[42]  This included implementing a policy barring disruptors and independent pharmacies from sharing data and working with competitors to CVS Health, which was shown in CVS Caremark's own internal emails:

> 3.    Facilitate the operation of a pharmacy billing hub, or alternative pharmacy provider (with or without common ownership):
>
> a.    Sharing eligible person's private and confidential identify information with third parties such as marketers or pharmaceutical hubs.
> b.    Leveraging multiple third party software platforms to obtain drug reimbursement data.
> c.    Act as a third party billing hub to test and transfer prescriptions to local pharmacy providers.
> d.    Participate as a fulfillment center (e.g, local pharmacy provider) for a third party billing entity.
> i.Dispense medications pursuant to prescriptions obtain from non-prescriber third party entities.
> ii.Collecting copayments on behalf of a third party entity.
> iii.Obtaining payment from third party entities for dispensing services provided as a local hub provider.
>
> In the event Provider breaches this provision of the Provider Manual, Caremark, on its own behalf, or on behalf of a Plan Sponsor, may terminate the Provider Agreement (or Provider's participation in specific Plans or networks) and may exercise other remedies available to Caremark, including chargeback of applicable claims.
>
> **Amish Kapadia PharmD** | Manager, Network Pharmacy, CVS Caremark
>
> 9501 E Shea Blvd. Mail Code 053, Scottsdale, AZ 85260

*"Tweaked" provider manual language to address independent pharmacies working with hub pharmacies; CVS_HJC_00011412.*

---

[41]   *Id.*, at 16.

[42]   *Id.*, at 17.

90.    Most relevant to this Action, the Committee found that CVS weaponized audits and used cease-and-desist letters to control independent pharmacies:

> Documents obtained by the Committee [] suggest that CVS Health attempted to eliminate competition from rival hubs and force independent pharmacies toward its own products through its use of cease-and-desist letters.  Specifically, CVS Health used [pretexts] to subject independent pharmacies to burdensome and costly audits[.]
>
> …
>
> In other words, CVS Health prohibited CVS Health prohibited independent pharmacies from using hubs to submit insurance claims or collect patient copays and demanded the independent pharmacies forgo reimbursement for medications already dispensed by reversing the insurance claim.  CVS Health also threatened to terminate the independent pharmacy from the network for failure to comply with the demands.

91.    Ultimately, the Committee stated that it "had uncovered evidence of anticompetitive actions taken by CVS Health to protect itself from competition.[43] Congress followed up on the Report by holding hearings on January 23, 2026 which excoriated the vertical integration and attempted monopolization of the healthcare industry by major players, including by CVS.  According Mr. Joyner, CVS claims that this vertical integration and attempted monopolization is "a model that works really well for the American consumer."[44]

---

[43]    *Id.*, at 32

[44]    Rebecca Pifer Parduhn, "*Insurance CEO's No Good, Very Bad Day on the Hill*," (HEALTHCARE DIVE ONLINE) (Jan. 23, 2026), at

92.     McKesson has also been under government watch due to potential violations of the antitrust laws.

93.     In a letter dated October 29, 2024 by United States Senator Elizabeth Warren to former FTC Chair Lina Khan, Senator Warren highlighted McKesson's significant market share in the prescription medication wholesale market, stating, in relevant part, "[…] over the years, major wholesalers – including [] McKesson – have leveraged their market power to lock existing customers into restrictive contracts, block out competing wholesalers, and squeeze generic drug manufacturers, leading to more frequent drug shortages and higher drug costs.  In addition to dominating the wholesale market, [] McKesson [has] also amassed a bevy of vertically integrated health care entities, including group purchasing organizations, specialty pharmacies, specialty drug manufacturers, data analytic firms, and provider practices."[45]  The *Warren Letter* warned of McKesson's efforts to "stifle competition and lead to even higher costs for patients" in potential violations of the antitrust laws.

---

https://www.healthcaredive.com/news/health-insurance-ceos-house-hearings-affordability/810269/.

[45]  Letter to FTC Chair Lina Khan Regarding McKesson, UNITED STATES SENATOR ELIZABETH WARREN (OCT. 29, 2024), at https://www.warren.senate.gov/imo/media/doc/letter_to_chair_of_federal_trade_commission_on_oncology_deals.pdf (the "*Warren Letter*").

94.    On April 15, 2025, United States President Donald J. Trump took decisive action against the role of PBMs with respect to drug pricing and their role in the healthcare industry.[46]  The President's executive order, "Lowering Drug Prices by Once Again Putting Americans First," requests that Congress take action to question the existence of PBMs, naming one such PBM: CVS Caremark.[47]

### *The Structure and Characteristics of the Relevant Market Render Conspiracy Plausible*

#### *The Related Markets are Highly Concentrated*

95.    This Action involves the interplay of four different markets which each significantly affect interstate commerce: (1) the Retail Pharmacy Market, (2) the Pharmacy Benefit Manager Market, (3) the Prescription Medication Wholesale Distribution Market, and (4) the Market for Pharmacy Services Administrative Organizations.

96.    *The Retail Pharmacy Market.*   The pharmacy market is highly concentrated, with just a few firms controlling the majority of sales downstream to patients.  As of the end of 2024, just three pharmacy chains control over 50% of the pharmacy market, including CVS Pharmacy (which has the largest market share at 25.1%), Walgreens Boots Alliance (14.6%) and Cigna's Accredo pharmacy

---

[46]   Thomas Shipp, "*Trump Signs Executive Order to Slash Drug Prices, Target PBMs,*" LPL FINANCIAL (ONLINE) (May 15, 2025), at https://www.lpl.com/research/blog/trump-signs-executive-order-to-slash-drug-prices-target-pbms.html.

[47]   *Id.*

(10.6%). This concentration is compounded by the fact that nearly all of the top pharmacies are vertically integrated (like CVS Pharmacy is) and are affiliated with a PBM (like CVS Caremark). The implications of this are that a vertically integrated healthcare company which owns both a chain of pharmacies and a PBM is able to steer patients away from independent pharmacies and to its own retail pharmacies. This control over the sales, as well as the levers of power which a PBM has over an independent pharmacy (as alleged herein), gives healthcare conglomerates a nearly unnavigable moat around its market share which cannot be overcome by competitors.

97.    *The Pharmacy Benefit Manager Market.* The PBM market, responsible for acting as a third party tasked with pricing medications and receiving reimbursement from insurers, is concentrated as well. Indeed, in 2024, about 80% of the prescriptions processed by pharmacies were done by only three PBMs: CVS Caremark (27%), Cigna (30%) and OptumRx by UnitedHealth Group (23%). This limits the price competition and the ability of independent pharmacies to negotiate with a variety of different PBMs in order to receive the best pricing and reimbursement systems. And, because each of the top three PBMs all own a retail pharmacy chain, they have the vertical power to dictate better pricing for their own pharmacies, harm competitors to those pharmacies, and, when their competitors are

pushed to the brink financially, to capture their customer base and steal their market share.

98.    *The Prescription Medication Wholesale Distribution Market.*    The wholesale market which distributes prescription medication is also highly concentrated.    Additionally, even non-pharmacy businesses (like McKesson's McKesson Wholesale business) are at the behest of corporations like CVS which have control over their business model.    Put differently, if McKesson wishes to remain in business, it must prioritize its relationship with CVS Pharmacy above all others.    This is highly problematic for independent pharmacies given that the market for wholesalers of prescription medications is even more concentrated than the retain pharmacy market.    As of 2022, three wholesalers of prescription medications control 92% of downstream sales to retail pharmacies in the United States: AmerisourceBergen, Cardinal Health, and McKesson Wholesale.    This leads to benefits, efficiencies, and favoritism between major retail pharmacy chains and the largest wholesalers of medication – for example, in a recent study on the consolidation of the wholesale prescription drug selling market, The Commonwealth Fund concluded that "[c]onsolidation in the pharmacy industry has resulted in large chains being able to negotiate lower generic drug prices with wholesalers.    Although this may represent increased purchasing efficiency for payers and patients, it puts

financial pressure on institutions that have historically relied on generic drug margins to remain profitable, such as independent pharmacies[.]"[48]

99.    *The Market for Pharmacy Services Administrative Organizations*.    The PSAO market is highly concentrated as well. According to the Pharmaceutical Care Management Association, more than 83% of all independent pharmacies utilize a PSAO – and, of these independent pharmacies, over 75% contract with PSAOs owned by one of the "Big Three" wholesalers – Amerisource Bergen, Cardinal Health and McKesson.[49]    Thus, PSAOs and wholesalers share similar vertical integration relationships to PBMs and chain retail pharmacies.    PSAOs, however, remain a black box-sort of business mode; as the Pharmaceutical Care Management Assocation also reports, "PSAOs lack transparency and there is almost no federal or state oversight of them."[50]

---

[48]  "*The Impact of Pharmaceutical Wholesalers on U.S. Drug Spending*," THE COMMONWEALTH FUND (ONLINE) (July 20, 2022), at https://www.commonwealthfund.org/publications/issue-briefs/2022/jul/impact-pharmaceutical-wholesalers-drug-spending.

[49]  "*The myth of the 'go it alone' independent community pharmacy*," PCMA (Online) (2024) at https://www.pcmanet.org/pharmacy-services-administrative-organizations-psaos-and-their-little-known-connections-to-independent-pharmacies/.

[50] *Id.*

100.    All in all, the relationships between these entities are complex, even in papers like those written by Pharmaceutical Care Management Association which attempt to distill and simplify it:



Figure 2. PSAOs in the Retail Pharmacy Supply Chain

101.    Make no mistake, this broken system is not damaged as the product of an accident – but is intentionally broken in an effort to preserve the status quo where patient revenue is prioritized over patient wellbeing and where independent pharmacies are caught in an unnavigable maze so that they cannot compete on the merits.

*Pharmacies and Prescription Medications Are Inelastic
Which Makes Them Susceptible to Collusion*

102.  Highly concentrated markets, such as the pharmacy market, are more susceptible to collusive conduct.  This is because nearly every market participant is forced to do business with a handful of pharmacy benefit managers and wholesalers.

103.  This is compounded by the inelasticity of prescription medications.  Prescription medications are an inelastic commodity product and do not differ significantly in terms of quality, appearance, or use, which renders them fungible.  Prescription medications, inclusive of both brand and generic medications, are largely produced and sold to the same standard specifications and must adhere to the same guidance promulgated by the FDA and other regulatory authorities.

104.  When products are interchangeable, companies are forced to win business from customers by competing on price.  Thus, collusive actors, such as here, are more likely to form relationships to benefit horizontal competitors selling interchangeable products s a means to avoid competition.

105.  Additionally, the consumer demand for prescription medications are relatively unaffected by price because prescription medications are a vital necessity with no adequate substitutes.  Prescription medications are sold in virtually all corners of the United States through pharmacies; and, although there are potential substitutes, like changes in diet and holistic treatments, the characteristics of these

products lack the efficacy and characteristics of prescription medications which make them attractive to customers.

*Market Participants*
*Have Had Numerous Opportunities to Collude*

106. Defendant and co-conspirators have been in business together since 2001, including a relationship that includes being each others' biggest source of business; namely, CVS Pharmacy's largest wholesale provider is McKesson Wholesale and McKesson Wholesale's largest pharmacy purchaser is CVS Pharmacy. Through this deep relationship, one which includes CVS Pharmacy purchasing over $50 billion worth of prescription medication annually from McKesson Wholesale, these two parties interact daily.

107. Additionally, McKesson's PSAO, HMA, takes its marching orders from CVS Caremark when servicing independent pharmacies like TinRx. Even though McKesson's PSAO agreement, the PPA, states that it creates no other rights for third parties, it clearly defies this contractual term by working to the benefit of CVS Caremark. Underlying this conduct is the inherent conflict of interest whereby each of these firms stand to benefit from CVS Pharmacy's success – including by warding off its competitors and preserving its market share.

108. These parties are in regular communication with each other – even in this matter, where HMA was informed by CVS Caremark about the August 24, 2023

audit; this communication is likely deeper than the relationship that takes place between a PSAO and a PBM, which is evidenced by HMA's characterization of CVS Caremark's August 24, 2023 audit as an unwinnable one.

109. Defendant and co-conspirators have numerous operations to collude outside of this set of facts, including at industry conferences, through communications between employees (inclusive of emails, phone calls, text messages, instant messages, amongst others), and through the exchange of data which may reactively trigger certain conduct.

### *The Pharmacy Market Has High Barriers to Entry*

110. The retail pharmacy market is extremely difficult to enter, as discussed herein.

111. Perhaps more than any other industry, entrance into this market is not just challenging independent of the barriers created by the conflicts of interest and the need to do business with conflicted parties, but because of the challenges which exist as a product of today's healthcare economy.

112. As is, it is extremely expensive to run a retail pharmacy because of tiny and unprofitable margins, the need to pay employees a living wage, the rising costs of living generally, difficulty securing necessary licensure and permits, and the overhead expenses attached to the lease of business locations. This becomes all the more difficult given the role that competitors (like CVS Pharmacy), PBMs (like CVS

Caremark), PSAOs (like HMA) and wholesalers (like McKesson Wholesale) play; these types of entities are unavailable, and Defendant themselves present a roadblock to a successful operation due to their ability to control pricing as well as dictate terms of operation.

### *Relevant Markets*

113.   To the extent a relevant market is necessary, the core relevant market in this Action is the United States market for retail pharmacies; and the submarkets which also have a role in this Action are the PBM market, the prescription medication wholesale distribution market, and the PSAO market.

114.   *Relevant Geographic Market.*  The markets at-issue in this action are located in the United States and do business across the country.

115.   *Relevant Product Market.*  This Action involves the interplay of one primary market (the Retail Pharmacy Market) and three different submarkets (the PBM Market, the Prescription Medication Wholesale Distribution Market, and the PSAO Market) which each significantly affect interstate commerce.

116.   *Market Power.* Each of the Defendant and co-conspirator has market power in this Action because of their ability to dictate pricing in the market (or submarket) in which they operate.

117.   Specifically: (1)  CVS Caremark has market power in the PBM market because it can dictate the reimbursement pricing of drugs sold by retail pharmacies

downstream (including impacting how other PBMs set prices because of the fact that every PBM has to compete with CVS Caremark as the largest PBM in the United States); (2) CVS Pharmacy has market power in the retail pharmacy market because it can dictate the prices that patients pay at retail due to the fact that it is the largest chain of retail pharmacies, it has a chokehold over the upstream distribution process due to its relationship with McKesson Wholesale (the largest prescription medication wholesaler) and it impacts what other non-CVS pharmacy locations charge for medication because of its affiliation with CVS Caremark; (3) HMA, as a PSAO, has market power in the PSAO market because it is the largest PSAO in the United States and it's vertical integration, as well as its relationship with CVS Pharmacy, allow it to strategically dictate pricing to retail pharmacies in a way that benefits itself in terms of margins and its largest customer, CVS Pharmacy; and (4) McKesson Wholesale has market power in the prescription medication wholesale distribution market because it is the largest wholesaler of prescription medications in the United States and because it decides downstream purchasing prices and quantities for pharmacies as well as gives preferential pricing to larger customers, like CVS Pharmacy.

118.  *Hypothetical Monopoly Test.*  The Relevant Market satisfies the test for market definition used by the federal antitrust enforcement agencies known as the "SSNIP test."  The test asks whether a hypothetical monopolist in a proffered market

could profitably impose a small but significant (typically 5%) non-transitory increase in price (a "SSNIP"), without causing a significant number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist.  If the SSNIP is profitable, the market is properly defined.  If not, the market is too narrowly defined and it does not encompass sufficient economic substitutes.

119.  Here, the SSNIP test is satisfied, and the market is properly defined.

120.  As described both above and below, the difficulties of running an independent pharmacy are due in part because of the ability of parties, like McKesson Wholesale and CVS Caremark, to make it exponentially harder to afford to purchase medications while margins continue to evaporate.

121.  Yet, despite this pricing and changes in margin, CVS Pharmacy and others like it have not lost market share.  The reason for this is simple: when CVS Pharmacy makes money, each of the parties stand to profit.

### *Antitrust Injury*

122.  In a normal functioning healthcare market, CVS would not be able to insulate its CVS Pharmacy's pharmacy market share – but the ability to use CVS Caremark's PBM controls, which include being able to abuse audit power and to steer patients to CVS Pharmacy makes it impossible for its competitors in the pharmacy market to remain in business.  CVS uses its vice grip to continue to

exercise unnatural control over the healthcare industry to the benefit of itself as well as its business partners, like McKesson.

123. Indeed, in many ways, CVS and McKesson benefited from the collapse of TinRx.

124. CVS was able to use its CVS Caremark arm as a PBM to weaponize its audit power. In lockstep, McKesson used HMA, its PSAO, as a means to stop the flow of funds to TinRx, as well as its wholesale business to keep TinRx from continuing to acquire the prescription medications it needed to continue to sell and, therefore, serve its patients. Both CVS and McKesson had every incentive to see through TinRx's plight; CVS's CVS Pharmacy could and would benefit from TinRx's eroded and surrendered market share and McKesson could aide CVS Pharmacy, its biggest wholesale customer, in the process. What began as the American dream for Christina Garcia quickly became a living nightmare at the hands of two self-motivated healthcare leviathans.

125. The harm caused by TinRx's demise cannot be understated.

126. Of the utmost importance, TinRx's patients lost a vital lifeline to access medical care which helped them navigate often-terminal illnesses. According to local reporting at the time of closure, community members told Action News in California that they were feeling 'shocked, confused, and without an option for

getting prescriptions close to home.'[51]  According to one patient, the closures would make it harder to get critical care, "[t]he issue with it closing down is a lot of people will have a lot more restrictions on where they can go.  It sucks, honestly, having to have a second pharmacy close down."[52]  The closure of independent pharmacies, especially given the types of patients that TinRx primarily served, leads to higher prices, less quality care, and fewer treatment options for patients.

127.   Secondarily, TinRx was a thriving member of the communities in which it had brick-and-mortar locations – which meant that it employed dozens of individuals in each locality.  Its unanticipated closure resulted in job loss and significant hardship to the many employees who called TinRx home.

128.   Finally, much of the harm caused by CVS and McKesson's conduct fell on the shoulders of Christina Garcia and PJ Nachman, who saw their decades-long creation evaporate within months, actual suffering amongst their patient-base as which scrambled to find lifesaving medications and care, the pain of terminating their faithful employees, and their own financial demise.  To make matters even

---

[51]  Camille Acevedo, "*The closure of Latimer's Pharmacy is leaving people with questions in Los Molinos*," ACTIONNEWSNOW (ONLINE) (Apr. 12, 2024), at https://www.actionnewsnow.com/news/the-closure-of-latimers-pharmacy-is-leaving-people-with-questions-in-los-molinos/article_a6abd94e-f914-11ee-98ad-d7d350ea0f1a.html.

[52]  Camille Acevedo, "*Old Time Drugs Pharmacy in Corning is closing next week*," ACTIONNEWSNOW (ONLINE) (Apr. 17, 2024), at https://www.actionnewsnow.com/news/old-time-drugs-pharmacy-in-corning-is-closing-next-week/article_24ebb90e-fd12-11ee-9ba9-1bbf967f4ab8.html#.

worse, TinRx was in early stage conversations with interested investors who sought to help the company grow and expand so that it could continue doing the work of being a "*stigma-free pharmacy*."

129.    Under ordinary circumstances, CVS Pharmacy (and CVS's biggest wholesale provider of prescription medication, McKesson) would have been forced to compete with TinRx on the merits – driven by TinRx's business acumen, creativity, and ability to innovate.  However, the vertical integration of the United States' healthcare economy allowed for the collusive conduct between two pharmaceutical giants in order to protect each others' market power.  CVS and McKesson both manipulated lines of business (here, CVS's CVS Caremark and McKesson's HMA) in order to profit their other lines of business (CVS Pharmacy and McKesson's wholesale business), as well as each other.

### Harm to the Public At-Large

130.    The conduct of Defendant to drive TinRx out of business has had substantial harm to the public at-large.  Namely, TinRx's patients have fewer options to purchase medications and have less intrabrand price competition to drive down the prices of already expensive products.  This is made even worse by the fact that the medications that many of these patients seek are live-saving medications.  The State of California even commented on the detrimental effect of TinRx's closure.

131. Additionally, TinRx's employees, of which they had over 50, were forced to lose their jobs and uproot their lives as a result of TinRx's closure.

### *Recidivist Conduct*

132. The conduct as alleged herein is not a novel set of circumstances caused by a series of unfortunate events, it is CVS's playbook.

133. There have been numerous instances of CVS Caremark overstepping and abusing within the bounds of its audit power as a PBM as well as HMA cutting off access to the flow of funds for independent pharmacies. In cases filed around the country, independent pharmacies, like TinRx, have sought relief in federal court for this type of conduct.[53]

---

[53] *See, e.g., Battlecreek Pharmacy, Inc. v. Health Mart Atlas, LLC*, Case No. 8:20-cv-02425 (M.D. Fl. Mar. 15, 2021), at ECF No. 31 (alleging abuse by HMA cutting off the supply of funding through central pay due to a CVS Caremark audit, denying motion to dismiss in-part);

*Cavalier Pharmacy, Inc. v. Health Mart Atlas, LLC*, Adversary Proc. No. 23-bk-07002 (W.D. Va. Mar. 8, 2023), at ECF No. 24 (denying mot. for preliminary injunction but stating, "[a]rguably, the strongest factor weighing in favor of the temporary injunction is the public interest. Closing this independent pharmacy, which provides a wide range of unique and critical services to this rural pharmacy, will be devastating to [Cavalier], to the town [which Cavalier services], to [the County Cavalier services,] and to residents of the surrounding areas […] it will be a tremendous loss to the community") (collecting cases).

## **CLASS ACTION ALLEGATIONS**

134.   Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23, seeking certification of the proposed classes (collectively, the "Class"):

> Nationwide Class: All independent pharmacies in the United States which used CVS Caremark as a pharmacy benefit manager from the beginning of any applicable statute of limitations through the date of judgment or whenever the conduct ceases ("Class Period").

> California Sub-Class: All independent pharmacies in the State of California which used CVS Caremark as a pharmacy benefit manager from the beginning of any applicable statute of limitations through the date of judgment or whenever the conduct ceases ("Class Period").

135.   Excluded from the proposed Class are Defendant and any such entities in which the Defendant has a controlling interest, the Defendant's agents, employees and legal representatives, any judge or judicial officer to whom this matter is assigned and any member of such judge or judicial officers' staff and immediately family, as well as all resellers of the Products.

136.   *Numerosity.*  The members of the Class are so numerous that joinder would be inefficient and impracticable.

137.   *Commonality.*  There are common questions of law and fact relevant to the Class, and these questions predominate over any questions affecting individual Class members.   These common questions of law and fact include, without limitation:

    i.  Whether Defendant violated the antitrust laws;

    ii.  Whether Defendant violated state and common law statutes and doctrines;

    iii.  Whether Defendant engaged in the conduct as alleged;

    iv.  Whether Defendant was unjustly enriched;

    v.  Whether Plaintiff was harmed;

    vi.  The measure of damages to Plaintiff and Class members; and

    vii.  Whether Plaintiff is entitled to declaratory and injunctive relief.

138. *Typicality.* Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendant's uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, such that there are no defenses unique to Plaintiff. The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

139. *Adequacy of Representation.* Plaintiff will fairly and adequately represent and protect the interests of the Class members in that she has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiff suffered

are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff has retained counsel experienced in class action litigation, and Plaintiff intends to prosecute her action vigorously.

140.  *Superiority of Class Action.*  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.  In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

141.  The litigation of the claims brought herein is manageable.  Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

142.  Adequate notice can be given to Class members directly using information maintained in the parties' records.

143.  *Predominance.*   The issues in this action are appropriate for certification because such claims present only particular, common issues, the

resolution of which would advance the disposition of this matter and the parties' interests therein.

144.  This proposed class action does not present any unique management difficulties.

## FIRST CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

## 15 U.S.C. § 1

## (NATIONWIDE CLASS)

145.  Plaintiff realleges and repeats every allegation from paragraphs 1-144 as if fully set forth herein.

146.  Defendant's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits contract, combinations, and conspiracies in restraint of trade or commerce.

147.  The retail and specialty pharmacy markets are both relevant antitrust markets.  The sale of retail prescription medication products and the sale of special prescription medication products are each involved in trade and commerce.

148.  As alleged herein, CVS Caremark and HMA conspired to use CVS Caremark's audit power to the benefit of CVS Pharmacy (which horizontally competed with TinRx) and of McKesson Wholesale (whose biggest purchaser of wholesale prescription medications was CVS Pharmacy) to the detriment of TinRx

and for the benefit of Defendant, CVS Pharmacy.  The conduct of CVS Caremark to abuse its regulatory audit power to incapacitate TinRx and the aide rendered by McKesson's HMA (to cut off access to funds through central pay) as well as McKesson Wholesale (to cut off access to the flow of prescription medication for downstream sale by TinRx) was a deliberate attempt to preserve CVS Pharmacy's market power.

149.  These contracts, combinations, or conspiracies are harmful to competition and foreclose a substantial share of competition by way of an up-and-coming business like TinRx which sought to provide retail and specialty prescription medications in the same markets competed in as CVS Pharmacy.

150.  Defendant's conduct, taken individually as well as collectively, has no legitimate business purpose or procompetitive justification or effect, and any such effects are substantially outweighed by anticompetitive injury.

151.  Defendant's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.  TinRx, its employees, and its customers have all suffered significant harm as a result of Defendant and co-conspirators' conduct, including in the form of past and potential lost customers and revenue. These are the types of harms the antitrust laws were codified to protect against.

## SECOND CAUSE OF ACTION

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

## CAL. BUS. & PROF. CODE § 17200, *et. seq.*

## (CALIFORNIA SUBCLASS)

152.   Plaintiff realleges and repeats every allegation from paragraphs 1-144 as if fully set forth herein.

153.   Defendant's conduct violates California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits unlawful, unfair, or fraudulent business acts or practices.

154.   Defendant's conduct is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1 and constitutes unjust enrichment under California's common law. For these reasons, Defendant's conduct is also unfair under the UCL.  Defendant's conduct is additionally unfair because it was designed and executed to harm TinRx's ability to compete, thereby restraining competition.

155.   Defendant's business practices are unfair because they offend public policy and harm the public at-large; namely, they are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious.  The injuries caused by this conduct, and the resulting harm to TinRx, TinRx's employees, and TinRx's patients, outweigh the possible utility from these acts.  Additionally, each Defendant and co-conspirator on its own violated the UCL through unfair business practices: CVS

weaponized CVS Caremark's own audit power in order to destroy a horizontal competitor of its CVS Pharmacy business; McKesson's HMA, at the command of CVS Caremark, halted access to TinRx's flow of funds through central pay and continued to delay resolution until TinRx was effectively no longer operable; and McKesson's McKesson Wholesale stopped the flow of wholesale prescription medications to TinRx so it could no longer sell products to consumers.

156.   This conduct, taken both individually and collectively: (1) harmed TinRx and its owners by destroying their business, (2) harmed TinRx's employees by causing them to lose their jobs as TinRx was forced to wind down its operations, and (3) harmed TinRx's vulnerable patients who relied on TinRx's offerings, discrete packaging, affordable pricing, and concierge service to treat their (often terminal) illnesses.  The impact on TinRx, TinRx's many employees, and TinRx's vulnerable patients constitutes harm to the public at-large.

157.   As a direct result of Defendant's unlawful and unfair conduct, TinRx has suffered significant harm, including lost market share, lost profits, and litigation costs.

## THIRD CAUSE OF ACTION

## CONSPIRACY

## (NATIONWIDE CLASS)

158.   Plaintiff realleges and repeats every allegation from paragraphs 1-144 as if fully set forth herein.

159.   Plaintiff TinRx was harmed by Defendant's coordination with co-conspirators and cooperation to put TinRx out of business, and each Defendant, as discussed above and below, is responsible for the harm to TinRx because of a conspiracy to violate the causes of action pled herein.

160.   This agreement, cooperation, and coordination by the adverse parties caused and continues to cause TinRx, its employees, and its patients' harm. Additionally, each of the parties is responsible, as each were aware of the financial gain each time they protect and/or usurp additional market share for CVS Pharmacy.

161.   All of the actions of Defendant set above and below were in violation of the rights of TinRx and committed in furtherance of the aforementioned conspiracy and agreements.   Moreover, each of the parties lent aid and encouragement and knowingly ratified and adopted the acts of the other.  As a proximate result of the wrongful acts alleged, TinRx suffered significant harm.

## FOURTH CAUSE OF ACTION

## UNJUST ENRICHMENT

162.   Plaintiff realleges and repeats every allegation from paragraphs 1-144 as if fully set forth herein.

163.   Each Defendant received pecuniary and financial benefits at the expense of TinRx; but none more so than CVS Pharmacy – TinRx's direct competitor.  TinRx conferred benefits onto each of the non-CVS Pharmacy co-conspirators, including financial gain stemming from agreements to do business and revenue gained from TinRx's sales. The non-CVS Pharmacy co-conspirators accepted these benefits and profited heavily from them.

164.   However, the non-CVS Pharmacy co-conspirators each deliberately made a choice that it would be more profitable to eliminate TinRx as a horizontal competitor of CVS Pharmacy than to continue to do business with TinRx.  The non-CVS Pharmacy co-conspirators each used their respective agreements with TinRx to make it impossible for TinRx to survive in the Relevant Market: all to the benefit of CVS Pharmacy.

165.   Under principles of equity and good conscience, CVS Pharmacy should not be entitled to retain the money made through these unconscionable acts.

166.   As to CVS Pharmacy, TinRx has no other adequate remedy at law.

167. As a direct and proximate result of Defendant's conduct, TinRx suffered injury in the form of economic collapse.  CVS Pharmacy should be compelled to disgorge profits from this unlawful scheme into a common fund or constructive trust.

## **REQUEST FOR RELIEF**

168. To remedy these unlawful acts, Plaintiff requests that the Court:

a.      Find that Defendant's conduct was unlawful, as alleged herein;

b.      Award such injunctive relief and other equitable relief as the Court deems just and proper;

c.      Award Plaintiff members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution or disgorgement of profits unlawfully obtained;

d.      Award Plaintiff pre-judgment and post-judgment interest;

e.      Award Plaintiff reasonable attorneys' fees, costs and expenses; and

f.      Grant such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED:  March 29, 2026

Respectfully Submitted,

/s/ Blake Hunter Yagman
James V. Burchfield Jr. (Bar No. 4095)
William V. Devine (Bar No. 3897)
  D'AMICO BURCHFIELD, LLP
536 Atwells Avenue
Providence, Rhode Island 02909
Tel.:    401-454-1212
Email:  jvb@dblawri.com
          wvd@dblawri.com

Local Counsel for Plaintiff TinRx
and the Proposed Class

Blake Hunter Yagman*
  YAGMAN PLLC
1050 30th St. N.W.
Washington, D.C. 20007
Tel.:    929-709-1493
Email: blake.yagman@yagmanpllc.com

Lead Attorney for Plaintiff TinRx
and the Proposed Class

*Pro Hac Vice Forthcoming